UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| Melvin Kornberg,<br><br>　　　　Plaintiff<br><br>vs.<br><br>United States of America, et al.,<br><br>　　　　Defendants | Case No.: 12-cv-1961-JAD-PAL<br><br>**Findings of Fact, Conclusions of Law, and Judgment Following Bench Trial** |

　　　Plaintiff Melvin Kornberg is a decorated veteran of the United States Army. He claims that his chorda tympani nerve was cut during a left-ear stapedectomy surgery at the VA hospital in San Diego, damaging his sense of taste and leaving him with nosebleeds and vertigo.[1] Kornberg contends he was never consciously informed of these risks before the surgery and, had he been, he would not have gone forward with it.

　　　This case proceeded to a bench trial on February 2, 2016, on Kornberg's single failure-to-obtain-informed-consent claim against the United States under the Federal Tort Claims Act (FTCA).[2] I heard testimony from Kornberg; Dr. Sumana Jothi, the surgical resident who performed the surgery; and Dr. Andrew Patel, the medical resident who obtained Kornberg's signature on the informed-consent form the morning of surgery. The parties also stipulated to an additional proffer of testimony from Kornberg's anesthesiologist, Dr. John Drummond.

　　　Having reviewed the parties' blind post-trial briefs[3] and proposed findings of fact and conclusions of law, along with the stipulated exhibits and my copious notes taken during the trial, I now enter judgment in favor of the defendant based on the findings and conclusions below.

---

[1] ECF 1.

[2] ECF 18 (stipulated dismissal of all but negligence claim); ECF 49 (order denying motion for summary judgment); ECF 64 (minutes of bench trial).

[3] ECF 66, 67.

**Findings of Fact**[4]

1. Plaintiff Melvin Kornberg is a veteran of the United States Army. He served during the years 1962–64, primarily as a photographer.

2. Since 2004, Kornberg has been retired from professional photography and residing in Southern Nevada.

**A.   Kornberg's pre-operative treatment at the VASDMC**

3. Kornberg receives medical care without cost to him from the U.S. Department of Veterans Affairs ("VA").

4. Kornberg has been wearing hearing aids since the late 1980s or early 1990s.

5. In May 2008, the Southern Nevada VA referred Kornberg for audiological evaluation and services to the VA's Medical Center near the University of California, San Diego ("UCSD").

6. Kornberg's first visit to the VA San Diego Medical Center ("VASDMC") was on May 27, 2008.

7. Kornberg made several additional trips to the VASDMC between June 2008 and February 2009.

8. These trips related to a condition in his left ear called ostosclerosis and consideration of a surgical procedure known as a stapedectomy—an elective surgical procedure that has the potential to improve the hearing loss associated with ostosclerosis.

9. Kornberg's medical records, created and maintained by the VASDMC in the usual course of its business, reflect the following:

   a. An October 9, 2008, medical record (Ex. 64) indicates that Kornberg was scheduled for left stapedectomy on February 23, 2009, had no further questions, and would meet with the operative team in February 2009.

   b. Another October 9, 2008, medical record (Ex. 2) also indicates that Kornberg was scheduled for a left stapedectomy on February 23, 2009, verbalized understanding, and agreed with his plan of care.

---

[4] To the extent that any finding of fact is more properly considered a conclusion of law, and vice versa, it should be so considered.

|   |   |   |
|---|---|---|
|   | c. | On February 19, 2009, Kornberg returned to the VASDMC for various tests (including blood work and electrocardiogram) and for preoperative consults (with the anesthesiology department and with Drs. Patel and Jothi from the Ear, Nose, and Throat surgical department).[5] |
|   | d. | Another February 19, 2009, medical record (Ex. 34) indicates that a consent form would be completed on the day of surgery and that Kornberg admitted on February 19, 2009, that he felt calm. |
| 10. |   | Drs. Patel and Jothi were in medical residency at the UCSD as of February 2009; their six-year residencies included rotations at the VASDMC.  As of February 2009, Dr. Patel was in his fourth year of residency; Dr. Jothi was in her sixth year of residency. |
| 11. |   | Kornberg has no recollection of the February 19, 2009, preoperative meeting with Drs. Patel and Jothi. |
| 12. |   | Inherent in the stapedectomy procedure is some movement or disruption of the chorda tympani nerve; it is the first thing a surgeon encounters after incising the eardrum and accessing the middle ear.  Post-surgery vertigo is also a common risk of the procedure. |
| 13. |   | Kornberg signed some health care and surgery-related documents on February 19, 2009.[6] |
| 14. |   | Kornberg arrived at the VASDMC on February 22, 2009, and stayed overnight in the lodging wing of the Medical Center. |

**B.    The February 23, 2009, surgery**

15.   Kornberg awoke on the morning of February 23, 2009, between 5:30 a.m. and 6:00 a.m.

16.   By 6:00 a.m., Kornberg had been moved from the lodging room to the preoperating holding room, which was near the operating room.[7]

17.   The preoperative holding room has several individual bays for patients.

18.   Each bay contains a computer, screen, electronic signature pad, and stylus.

---

[5] *See* Exs. 3, 9 (at US00018, US00025), 26, and 49.

[6] *See* Exs. 22, 23, 24.

[7] *See* Ex. 42 at US000117.

19. In February 2009, the VASDMC used electronic rather than paper informed-consent forms.

20. With a surgical patient in a bay, Dr. Patel and an assisting nurse under his supervision would ask the patient his name, date of birth, and why the patient was there. This was done to check the patient's identification, confirm his scheduled procedure, and provide some indication that the patient was alert and oriented.

21. Consistent with the VASDMC's practice and equipment, Dr. Patel's process was to go through a surgical consent form with the patient on the electronic screen, particularly the listed risks of the procedure, and then ask the patient to relay back certain information in his own words to show a higher level of consciousness than just passive listening.

22. From 6:52 a.m. to 6:53 a.m., Dr. Patel, Kornberg, and nurse/witness Vinzon used the electronic signing pad and stylus to place their signatures on the consent form for the stapedectomy.[8]

23. Section 12 of the informed-consent form is entitled "**WHAT ARE THE KNOWN RISKS OF THIS TREATMENT/PROCEDURE?**"[9]

24. Among the "known risks" expressly listed on the consent form are "Failure to improve hearing"; "Permanent hearing loss"; "Vertigo"; "Injury to facial nerve (facial paralysis)"; and "Injury to chorda tympani nerve (change in taste)."[10]

25. Among the statements attested to by Dr. Patel on the consent form are that Dr. Patel has discussed with the patient the risks of the procedure; the patient demonstrated comprehension of the discussion; and the patient was offered the opportunity to review a printed copy of the consent form.[11]

26. Among the statements attested to by Kornberg on the consent form are the following: "Someone has explained this treatment/procedure and what it is for. Someone has explained

---

[8] *See* Ex. 10 at US00023–24.

[9] *Id*. at US00020.

[10] *See id*. at US00020–21.

[11] *See id*. at US00023.

|   |   |
|---|---|
|   | how this treatment/procedure could help me, and things that could go wrong. Someone has told me about other treatments or procedures that might be done instead, and what would happen if I have no treatment/procedure.  Someone has answered all my questions.  I know that I may refuse or change my mind about having this treatment/procedure.  If I do refuse or change my mind, I will not lose my health care or any other VA benefits." "I have been offered the opportunity to read the consent form," and "I choose to have this treatment/procedure."[12] |
| 27. | At 7:06 a.m., Dr. Patel electronically signed a medical record indicating that risks, benefits, and alternatives including, but not limited to, facial nerve injury had been explained and Kornberg wished to proceed.[13] |
| 28. | At 7:26 a.m., Dr. Mehta, the fellow and attending surgeon, electronically signed a medical record indicating that he had met with Kornberg, that Kornberg had been informed of the risks, benefits, and alternatives to the stapedectomy, and that Kornberg agreed to proceed.[14] |
| 29. | Neither Dr. Jothi nor Dr. Patel had an independent recollection of Kornberg or their visits with him, so they relied on their routine practices and detailed treatment and progress notes in Kornberg's records. |
| 30. | The testimony of Drs. Jothi and Patel established that it was the habit and routine practice of the VASDMC and its physicians and medical residents, including themselves, to: |
| a. | Discuss the risks of a procedure with a patient multiple times before the day of the surgery; |
| b. | Review the informed-consent form with the patient in detail on the day of, and shortly before, the procedure; |
| c. | Read aloud to the patient the portion of the informed-consent form that contains the list of risks; |

---

[12] *Id*.

[13] *See* Ex. 7 at US00085.

[14] Ex. 6.

    d.    Not place their own signature on the informed-consent form unless the patient could first repeat back the risks and benefits of the procedure or acknowledge they specifically heard them;

    e.    Not introduce sedatives or narcotics into the patient's IV until the informed-consent process is completed; and

    f.    Not obtain the consent form from a patient if the patient is groggy or falling asleep or if there is any doubt that the patient has a clear mental status.

31. The testimony of Drs. Jothi and Patel also established that it was the habit and routine practice of the VASDMC and its physicians and medical residents to do the following for stapedectomy patients:

    a.    Describe the risks in the order most dangerous or catastrophic, listing, *inter alia*, permanent vertigo, permanent facial paralysis, the other risks of general anesthesia, ear-drum perforation, and taste disturbance; and

    b.    Advise patients of these risks throughout pre-operative appointments.

32. The testimony of Dr. Jothi also established that it was her habit and routine practice at the time of this surgery to meet with her patients and the entire surgical team (in a "huddle") shortly before the surgery and review the risks and benefits of the stapedectomy surgery, specifically including the most common risks of vertigo, taste disturbance, and hearing loss.

33. This habitual conduct was semiautomatic and invariably regular and that these testifying physicians acted in accordance with these habits and routine practices when dealing with Kornberg at all times relevant here.

34. Kornberg was moved from the preoperative holding room to the operating room at 7:55 a.m. at which time anesthesia was started.[15]

35. At no time during the morning of February 23, 2009, did Kornberg make any statements to the effect of wanting more time to review the consent form, wanting more information, or wanting to postpone or cancel surgery.

---

[15] *See* Ex. 9 at US00014, Ex. 42 at US000117.

36. Kornberg presented no evidence of a motive that Drs. Patel, Jothi, Mehta, or Drummond[16] (the anesthesiologist) would have to obtain a consent form or move forward with elective surgery on a patient who was too sleepy or too groggy to make an informed and conscientious decision.

37. At any point up to the commencement of surgery—even after signing the consent form—Kornberg could have changed his mind about surgery or otherwise expressed a desire to stop.

38. Kornberg would not suffer any adverse consequences from the VA for choosing to postpone or cancel surgery on the morning of surgery.

39. A stapedectomy was a relatively common procedure at the VASDMC. Drs. Patel and Jothi estimated that approximately two to four stapedectomies per month were performed at the VASDMC during the course of their residencies at that facility. Dr. Jothi participated in approximately forty stapedectomies during her six years of residency.

40. Consistent with the information on the consent form, Drs. Patel and Jothi both testified that it is common for stapedectomies to result in some disruption or damage to the chorda tympani nerve and thereby some disruption or diminishment in the complex sense of taste on the associated side of the tongue, and Dr. Jothi also testified that vertigo is a common risk of stapedectomy surgery.

41. During Dr. Jothi's performance of the stapedectomy, Kornberg's left chorda tympani nerve suffered some disruption or damage.

42. As Dr. Jothi testified, in order for a person's taste to be completely affected (and not affected just on one side), the chorda tympani nerves on both sides of the face would have to be damaged. Because Kornberg had surgery on his left ear only, it is physiologically impossible for both of his chorda tympani nerves to have been affected and for the surgery to have resulted in his total loss of his sense of taste.

---

[16] I accepted a stipulated offer of proof from both parties that the testimony of Dr. Drummond (the anesthesiologist), had he testified, would be consistent with some or all of Findings of Fact 13, 36, and 37.

43. As both Drs. Patel and Jothi testified, nosebleeds are not a known complication, risk, or side effect of this surgical procedure.

44. A VA Handbook, effective August 17, 2009, was not in effect at the time of the subject surgery and did not set forth a state-law-based duty for this surgery.

45. I find overall the testimony of Drs. Patel and Jothi to be credible including, but not limited to, the following points:

   a. Based on their experience, the nature, risks, benefits, and alternatives for a stapedectomy procedure would have been discussed with Kornberg in 2008 or prior to the time that the stapedectomy was scheduled for a January 2009 and later February 2009 date.

   b. At the February 19, 2009, preoperative consult, Drs. Patel and Jothi would have discussed with Kornberg the upcoming stapedectomy surgery, including the main and most common risks of some damage or disruption to the left chorda tympani nerve and associated disruption or diminishment in sense of taste on the left side of the tongue;

   c. By 6:52 a.m. on February 23, 2009, Dr. Patel had reviewed and discussed with Kornberg the electronic consent form for the stapedectomy procedure, including the main and most common risks of some damage or disruption to the left chorda tympani nerve and associated disruption or diminishment in sense of taste on the left side of the tongue; and

   d. Dr. Patel would not have signed the consent form at 6:52 a.m., and Dr. Jothi would not have performed the stapedectomy procedure an hour later, if Kornberg had been too sleepy, too groggy, or otherwise exhibited signs that he was not alert, oriented, and freely consented to proceed.

46. I find the following points of testimony by Kornberg to be not credible:

   a. That Kornberg signed the consent form "seconds before surgery";[17]

---

[17] Ex. 21 at 10.

    b.    That Kornberg was "in surgery" at the time of Dr. Mehta's 7:26 a.m. note;[18]

    c.    That Kornberg signed a paper consent form on the day of the stapedectomy;

    d.    That Kornberg was groggy from anesthesia or otherwise impaired at the time he signed the consent form;

    e.    That Kornberg was too groggy from sleep at the time he signed the consent form (and implicitly that he was also too groggy, for the following hour, to express a desire to read or re-read the form, obtain more information, or postpone or cancel surgery);

    f.    That the day of the stapedectomy was the only day on which Kornberg signed papers related to the stapedectomy;

    g.    That Kornberg lost all sense of taste on both sides of his tongue; and

    h.    That the benefits, alternatives, and risks—particularly damage to the chorda tympani nerve (and change in taste) and vertigo—were never discussed with or disclosed to Kornberg prior to the stapedectomy procedure being performed on February 23, 2009.

50.    Kornberg offered no evidence of economic damages.

**Conclusions of Law**

1.    Subject to certain limitations, the United States may be held liable under the Federal Tort Claims Act for the negligent conduct of those acting in the course and scope of federal employment or office under the same circumstances as a private defendant would be held liable in accordance with the law of the place where the negligent act or omission occurred.[19]

2.    FTCA actions like this one are governed by the substantive law in the state where the alleged tort occurred—in this case, California.[20]

3.    In California, "[a] claim based on lack of informed consent—which sounds in negligence—arises when the doctor performs a procedure without first adequately disclosing

---

[18] Ex. 21 at 1.

[19] *See* 28 U.S.C. §§ 1346(b)(1), 2674.

[20] 28 U.S.C. § 1346(b)(1); *Delta Savings Bank v. United States*, 265 F.3d 1017, 1025 (9th Cir. 2001).

the risks and alternatives."[21]  "The fount of the doctrine of informed consent in California is" *Cobbs v. Grant*, which "anchored much of the doctrine of informed consent in a theory of negligence liability" and recognized "the obligation of a treating physician 'of reasonable disclosure of the available choices with respect to proposed therapy and the dangers inherently and potentially involved in each.'"[22]  *Cobbs* fashioned a two-part test for informed-consent violations:

> First, a physician must disclose to the patient the potential of death, serious harm and other complications associated with a proposed procedure. . . . Second, beyond the . . . minimal disclosure, a doctor must also reveal to his patient such additional information as a skilled practitioner of good standing would provide under similar circumstances.[23]

4. Rule 406 of the Federal Rules of Evidence allows the court to consider "[e]vidence of a person's habit or an organization's routine practice . . . to prove that on a particular occasion the person or organization acted in accordance with the habit or routine practice."[24]

5. In addition to the *Cobbs* factors, "[t]here must be a causal relationship between the physician's failure to inform and the injury to the plaintiff."[25]  A "causal connection arises only if it is established that[,] had revelation been made[,] consent to treatment would not have been given."[26]  California's causal relationship is an objective test that extends beyond the plaintiff's credibility.[27]  "[W]ith the 20/20 vision of hindsight," a patient may subjectively believe that he would have declined treatment, but justice is not served "by

---

[21] *Saxena v. Goffney*, 159 Cal. App. 4th 316, 324 (Cal. Ct. App. 2008).

[22] *Arato v. Avedon*, 858 P.2d 598, 604–05 (Cal. 1993) (quoting *Cobbs v. Grant*, 502 P.2d 1, 10 (Cal. 1972)).

[23] *Betterton v. Leichtling*, 101 Cal. App. 4th 749, 754–55 (Cal. Ct. App. 2002) (quoting *Cobbs*, 502 P.2d at 11) (internal quotation marks, brackets, and citations omitted).

[24] Fed. R. Evid. 406.

[25] *Cobbs*, 502 P.2d at 11.

[26] *Id*.

[27] *Id*. at 11–12.

      placing the physician in jeopardy of the patient's bitterness and disillusionment."[28] So the court must instead apply the objective test: "what would a prudent person in the patient's position have decided if adequately informed of all significant perils."[29]

6. Kornberg did not carry his burden to prove his claim.

7. The preponderance of the evidence, including the habit and routine evidence that I consider under FRE 406, shows that Drs. Patel and Jothi disclosed to Kornberg all risks of serious harm and other complications associated with the stapedectomy procedure and any other information that a skilled practitioner of good standing would provide under similar circumstances. Throughout the several pre-surgical visits over the course of several months to the VASDMC, the VA provided—and Kornberg had numerous opportunities to obtain—"adequate information [for] an intelligent choice" about the stapedectomy procedure.[30] At all relevant times, Kornberg maintained the "freedom to 'exercise . . . control over [his] own body' by directing the course of medical treatment."[31]

8. Kornberg failed to prove by a preponderance of the evidence that the VASDMC medical providers did not inform him, prior to the February 23, 2009, stapedectomy procedure, of the risks of the stapedectomy—particularly the risk of disruption or damage to the left chorda tympani nerve (and associated disruption or change in taste), vertigo, and failure to improve hearing loss. Kornberg failed to prove that his nosebleeds were a risk or result of the stapedectomy.

9. Even if Kornberg had proven that the VASDMC medical providers failed to inform him of the risks, he has not proven a causal relationship between the failure to inform and any injury. Although Kornberg now believes—with the 20/20 vision of hindsight—that he would not have consented to the treatment had he been informed of its risks, Kornberg has not proven

---

[28] *Id*. at 11.

[29] *Id*. at 11–12 (citation omitted).

[30] *Arato*, 858 P.2d at 607 (internal quotations and citations omitted).

[31] *Id*. at 608 (quoting *Cobbs*, 502 P.2d at 9).

that a prudent person in his position would have declined the surgery had he been adequately informed of all significant perils.

10. Defendant, the United States of America, is entitled to judgment in its favor.

## Conclusion

Based on these findings of fact and conclusions of law, and with good cause appearing and no reason for delay, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that judgment is entered in favor of defendant the United States of America and against plaintiff Melvin Kornberg. The Clerk of Court is directed to enter judgment accordingly and close this case.

DATED: February 19, 2016.

_____
Jennifer A. Dorsey
United States District Judge